Your Honor, members of the Court, Peter Scott here on behalf of the appellants. I'd like to reserve four of my minutes for rebuttal, if I might, please. The landowners that I represent objected and appealed in this case, and their appeal centers on the government's failure to satisfy the well-established burden for modification of a final judgment. Further, the appeal goes to the district court's use of an erroneous standard in order to approve its order-modifying prior court orders. The case law in the Ninth Circuit is quite well-established regarding the standard for modification of judgments. There is a compelling interest in finality, and I'm citing to Osborne v. Rubin. I'm sorry to do this to you, but I want to back up with the jurisdictional issue, specifically standing, because the government has said that your clients don't have standing, and part of that is whether this is redressable. As I start unpacking that, it seems to boil down to a question of whether in 1979, do I have the year right, the original decree, was that an in rem, was that a general adjudication, or was that a party adjudication? It was a general adjudication, Your Honor, specifically, and I'm going to cite to Nevada v. United States 463 U.S. 110. And in the Walker River Irrigation District cases, the court there explained that courts have recognized water right adjudications should be treated as in rem, not in personam, because you're evaluating the property rights between and among the various water users. Well, I mean, I think that's right as a general matter, but not when the United States comes in, in the specific context of where they were here, to determine, I mean, as I understood it, it started out to just say, hey, we want to get all permit users' rights adjudicated. And, in fact, the district court back in the 79 decree, and seems to repeat it later on, said we're specifically not going to get into a whole. I mean, these water basin adjudications are much more fulsome than what went on here, in part because they're addressing every landowner, and they were specifically not doing that here. So I'm not sure how you get to this as a general adjudication. A couple of different ways, Your Honor. When the state asked for modification of the original decision in the early 80s, it asked the court to do away with retained jurisdiction and to enjoin the tribe from asking for additional water in the future. And that request for modification was denied by the court around 1981, and it's cited in the briefing. I don't have the specific record citation for you. But in doing so, the court said, in effect, I realize that general stream adjudications like this are intended to create finality, but we're going to keep the retained jurisdiction in this case. In 2013, when the tribe finished briefing, this is after the USGS report was done, and this one I do have. It's found in the further excerpts of record at 104 and 105. The tribe acknowledged this was a general stream adjudication, and that was in 2013, I believe. But my question is, how can it even be? I mean, I know you're right. There was some district court language that was less than clear on this. Maybe the tribe said that, but how can it be a general stream adjudication? There was no notice sent out to thousands, I'm assuming, of non-permitted users, and that would have had to have been done in a general adjudication. Well, if you were going to quantify and establish specific elements of individuals' rights, I would agree with you. But in an in-rem setting where the court has entertained categories of water rights, it was the United States, the plaintiffs, that put on the evidence to show that these categories of water rights weren't necessary to be quantified. That does not mean that they weren't subject to the court's subject matter jurisdiction or that the court didn't enter findings specifically addressing uses of water as categories, domestic use of water, stock use of water, groundwater use in the upper basin. Those were specifically excluded from enforcement. On the strength of evidence presented by the plaintiffs, the plaintiffs made a decision not to summon in personam because they felt it wasn't necessary. That doesn't mean the court didn't exercise jurisdiction. The court made very specific findings about those categories of excluded water uses, and if the court hadn't exercised jurisdiction over those categories of water rights, we wouldn't be here discussing modification of the judgment. Okay, so let me ask my second question after we get to kind of general versus in-rem, which is in 1979, I think you have to take the position, but I wanted to clarify this, that that consent decree or the settlement agreement from 1979 actually circumvented and overrode Washington law as to water rights. Is that correct? Let me address, first of all, Your Honor, I don't concede that this was a consent decree. It's specifically a judgment, and that's a distinction we make in the briefing. No, I think I misspoke. So it's a settlement agreement, a judgment, but do you believe that the 1979 settlement agreement that was approved by the court in 1979, do you believe that that circumvented and took away rights that existed under Washington law? No, Your Honor. I've been involved in many statewide adjudications at this point. It's a common practice for water rights to be subordinated to senior rights in order to resolve the issue. What the tribe said, and I'll cite to the record here for you, and this is, I'll ask the court to take notice of it. It's in the court record at 261. It's a transcript, and Mr. Delwo arguing on behalf of the tribe said, the tribe argued in regard to the excluded uses, quote, the tribe and the government has excluded these minimum uses in order to simplify the lawsuit, even though they thought the same laws applied. So everybody was aware that these water rights could have been subjected to quantification and could have made subject to curtailment and enforcement under the decree. So from 1979 to 2021, your clients were still subject to Washington law on priority and curtailment. With the exception that the decree entered in 1979 and then as a final judgment thereafter, was not enforceable against their use of water. Help me understand. What does that mean? Well, let me use something from the record that I've cited to. In 2005, the federal water master came to the court and said, I found a state water right user cheating. I shut off his irrigation right, one that is subject to the decree, and later I found out he was irrigating ground with his domestic well in excess of the amount allowed under state law. Of the 5,000, right? Right, 5,000 gallons a day. What should I do? I don't have jurisdiction over these state issued water rights off the reservation. What should I do? And the court convened the parties and asked them that question. It turns out one of the elements of the settlement agreement at issue here in 2019 was a simple delegation of state enforcement authority to the federal water master. Had that been done at the time, that issue would be resolved. He could find them cheating, and incidentally, to be clear, the landowners don't object to that delegation of authority. So the problem is they didn't delegate it. They decided instead to retry the very same facts that were proposed by the government parties in 1979 and proceeded to do so. That's the point at which the United States Geological Service was hired to evaluate it. Did I answer your question? Well, sort of. I guess my point is if your clients in 2020 had used more than 5,000 gallons a day, they could have been found to be in violation of state law. I think they could be. There are several potential remedies. If somebody is exceeding 5,000 gallons a day of domestic use, they're subject to enforcement under Department of Ecology. If delegated, they would be subject to curtailment from the water master. And third, they could be served and brought into court and forced to quantify their water rights to establish exactly what the limit of their water rights is. Because presumably they could have been entitled to 5,000. They should be given an opportunity to show that they were entitled to more than 5,000. And if they're using more than 5,000, they would be subject, I presume under the case law, to curtailment. Once quantified. And see, that's my problem is once you have that and that exists, then you're basically agreeing that nothing in the 79 agreement affected your clients. No, Your Honor. I don't think that's right. Let me use stock, for example. There's a fairly clear standard and there's some detailed testimony about what it means. I haven't burdened the court. This is a heavy lift for all of us, 50 years of litigation. But the stock right under state law is unlimited. The Five Corner Farms case that's cited in some of the briefing allowed dairy farmers to use unlimited amounts of water for stock under state law. And that's the permit-exempt statute 90-44050. But the decree says you can use water for stock at the natural carrying capacity of the land, which is much, much lower. Several head, I don't have an exact figure. I believe I saw 30 head in a 300-acre area would have been considered acceptable. So there is a cap on stock use. The notion that somebody can go use unlimited amounts of stock water is inconsistent with the decreed amount available for this de minimis stock use. I don't find anything unusual at all about saying as long as you're staying under the domestic or de minimis amounts, you are not subject to being curtailed, shut off. Let me back up it for perspective. The basin yields 35,000 acre feet. The court decreed in excess of that to the tribe as senior rights. But I think that's what my hangup is, is once they decreed more than that to the tribe, which is either under the decree or under state law, your claims, in effect, could have been curtailed at any point in time, with or without the consent decree. Well, again, I'm troubled that the court's viewing that as a consent decree because the consent decree question doesn't come up until 2019. Okay. I'm not getting hung up on that. I'm just saying whatever this agreement is, the settlement agreement, your client's rights could have been curtailed with or without that because I think everybody agrees that the tribe's rights are superior. No, that's exactly the point, Your Honor. The tribe could have brought everybody in to court in personam, established the quantification of their right, and said every water right in the basin that is not ours can be curtailed. That could have been done. But it wasn't. It wasn't done. A final judgment was entered excluding limited uses from that power to curtail. That's what I mean by subordination, a term of art in the Montana adjudication that doesn't seem to have the same wide use as I suspected it should. But there's many other potential defenses. For 40 years now, people have exercised those rights without threat of curtailment. It's never been enforced. The senior user, if they thought they had the right to come forward and stop that use, could have done so and didn't. They tolerated it for four decades, and now they want to modify the judgment in order to obtain a right, which I think they concede they don't presently have, which is to curtail these rights. If they thought they had that right, if they thought the judgment granted it to them, they wouldn't have needed to modify the judgment. They would have just issued an order to curtail rights. And I see that I've cut into my two minutes. We'll give you some time. This is important. Thank you. Good afternoon, Your Honor. May it please the Court. John Smeltzer for the United States. Your Honors, I'd like to start with the standing question, and particularly with the issue of interpreting the original judgment in this case, because I think a lot of this case hinges on how that's interpreted. I understand what the objectors are arguing here, Your Honors, is that the original judgment provided them with a permanent, not only them, but all landowners in the Shamekin Basin, with a permanent right to exercise stock water and domestic use of water, not subject to priority enforcement. Well, I had thought the same thing, but the answers to the questions I got, he seemed to waffle, opposing counsel seemed to waffle on that a little bit and say that it had more to do with the remedies, I think, that could be imposed, whether they could actually get curtailment or not. You would agree that they couldn't get curtailment unless this had all been quantified. It couldn't be curtailed pursuant to this particular judgment and adjudication because those original rights, domestic and stock water, had been excluded as to parties, and because the objectors and all the other landowners within the Shamekin Basin who were only exercising, say, groundwater rights for domestic and stock water use were not included in the original judgment. You can't seek enforcement against persons who are not party to the judgment. But what we're arguing is the exclusion of persons from the original judgment is not the granting of a right, and that's where we get tripped up here is because what the objectors are arguing is that somehow this exclusion is turned into a permanent right to be forever exempt. I agree with you, but then my question turns to why did you actually ask for modification or why did the parties ask for modification on this issue? Because you sort of seem to inject it. There must have been some benefit to you because this right already existed under Washington law, right? I mean, separate and apart from the agreement. I'm going to get... Well, context-wise, these rights that we're talking about are mostly permit-exempt rights, which means they don't have to seek a permit under Washington law, and so they can automatically be used by persons... But they're not guaranteed until they go and get a permit, right? Well, they're not guaranteed against adjudication, but they can use the water without a permit. That's what the whole permit exemption is about. So the burden then shifts to the United States and the tribe and to the other parties to this judgment. If those uses are interfering with the water rights that are granted in the judgment to seek enforcement against them, but they're not parties to the case, right? So initially, when the issue came up about the increasing domestic use, the increasing number of wells in the basin, and the understanding that there is now... or the new understanding that there is now a hydrological connection between the upper basin and the middle and the lower basin, the water master raised this concern about, you know, domestic use and these other uses and whether they are limiting water rights of the named parties. And so the court ordered the parties to do a study. They did the study. They found this connection. They found that there was an impact. And then the question is, you know, what do we do about it? One of the things they could have done is try to bring in all these persons as parties to the case, therefore to get the United States' adjudicated right enforceable against them. That's not ultimately the path we chose. Instead, the tribe, the United States, and the state reached a settlement, right, that provides a safe harbor for uses that are mitigated under this mitigation program where the state has agreed to add water to increase stream flow during the key times of the year so that these domestic and stock water uses are being mitigated and are not impacting the tribes, right? And so as long as that's happening, there's a safe harbor, right, under the settlement for persons who are doing this. And then the tribe and the state have agreed, you know, not to enforce the rights against those particular uses. The purpose of the modification was just to set the table for that settlement, to allow that settlement to be implemented, right, because the backside of the safe harbor is if there are uses that go beyond the mitigation limits in the safe harbor, the tribe and the United States are setting up against parties and against non-parties, putting them on notice that they potentially could be brought in then to this adjudication and be named as parties, and therefore we could attempt to seek rights against them. Your position would be the only way they get standing is when you actually bring in a case and say, okay, we're now going to adjudicate the water rights, we're going to put you in priority, and we're going to start curtailment. Then they would have standing to challenge that. If what happened here had changed their rights in any regard, we would say they have standing. Well, it's interesting. I mean, does the states, and maybe I guess the state will be arguing, so I'll save my question for the state. Keep going. Right. Well, one of the points I wanted to make with respect to the interpretation of the original judgment is to correct Your Honors. When asking the questions, you talked about the original agreement or the original consent decree. The original judgment was a judgment, you know, entered after trial. And so the question is what was the authority of the original court to provide some sort of, you know, out-of-priority rights? But your whole point is it didn't change their rights at all at the end of the day, and it didn't give them a guaranteed right, the objectors. Right. There are two parts to it, right? The objectors were not part of, they weren't named in the suit, right? But then there's also this provision in the suit that says domestic and stock water rights are not included. We submit that that was in the actual judgment to address the party's rights. And if you look at the record, you'll see there were two parties who asserted particular rights and were denied rights except for domestic and stock water use, and that's where those domestic and stock water provisions came from, the provision that says those rights are not included, which is just a way of saying we're setting those aside based on the record at this time because we, the United States agreed at that point on the facts that we didn't need to assert the rights. But in terms of interpreting the judgment, if the judgment is interpreted as providing some sort of permanent exemption from priority enforcement, then it's contrary to State water law. Then it's contrary to, you know, the Federal reserve right. And with respect to State water law, the State law is absolutely clear. The exemption, the permit exemption statute they rely on at Washington Code 90.40.050 has those permit exemption limits in it, but there is no exemption from priority enforcement. The Washington Supreme Court has held that on several occasions, in the case Campbell v. Gwynn that we cite in our brief, and also in the case of Whatcom County that the objectors cite in their brief. So it's absolutely clear that permit exemption is not taking these rights out of priority enforcement. And any right that... So what about this idea that, okay, they're a non-permitted, you know, use. They've been using this for 40 years. They've been using, say they've been using 4,000 gallons, which apparently would be a lot, but they were using 4,000 gallons of water for the last 40 years. Now they see this new modification and are like, oh, my gosh, we can only... We thought we had a guarantee. Now we realize it's not that we're violating the law if we use over 900, but now we're exposing ourselves to potential, I guess prosecution isn't the right word, but enforcement. And the answer is they could have been brought in anyway, right, because the original judgment from 1979, as modified in 1982, didn't guarantee them the right to use, you know, 4,000 gallons of water per day. But now you've put a little bit more of a target on them. And I wonder if that isn't enough for the objectors to say, whoa, you know, we thought we were just, you know, nobody was paying attention to us. Everybody said we weren't part of this. Now all of a sudden we are. Why don't they have standing based on that, that in some way their material expectation has changed? Well, I guess the short answer is it's not a reasonable expectation based on the language of the original judgment, the context of that case in Washington law. Well, except that, I mean, I understand that the facts have changed now, but there was the statement that de minimis water use doesn't affect it, and so everybody thought that they were kind of free and clear. Right. And, again, we submit that that language is relevant as to the parties to the case, right, not particularly to non-parties. It's consistent with the decision not to bring a suit against the person. But it never gave them a right. Right. But also the right they're claiming is a right to future development. They're not claiming just the right to continue doing what they've been doing. Right. And so what's reasonable in construing the record and what happened is to say, well, look, at the time of the judgment, in 1972 and 74, when the United States filed this complaint, there was a certain amount of domestic and stock water use going on by the parties, right, where the United States was in a position to not object to that use and say, okay, we don't need to include that in our suit because that's not what we're here about. But that can't be translated into a determination that for all time there's a, you know, now there's this right that they can develop water tomorrow, a year from now, 10 years from now, you know, up to the permit-exempt limit, not subject to priority enforcement. Right. State law doesn't give them that. The language of the original judgment, even if it were interpreted to apply to the non-parties here, doesn't give them that. There's no basis for construing that extra special outer priority, we can do it forever, exempt from your enforcement. Right. It's just not consistent with Washington law, federal law, or how these water rights adjudications have gone forward. I see that I've hit my time, and I want to allow Alan Reichman for the state time to speak. Thank you, Your Honor. May it please the Court, I am Alan Reichman, appearing for the State of Washington. Your Honors, allowing the settlement agreement to be implemented by affirming the district court will protect the senior water rights held by the Spokane Tribe and by state citizens with irrigation rights, assure that existing and future domestic and stock water use that is reasonable can continue without being curtailed, and perhaps most importantly, avoid years of protracted litigation through a major expansion of this case into a general adjudication involving hundreds of landowners outside of Spokane, Washington. I want to build on one of the- Can I ask one question for the state? Would you take the position now that you would be equitably stopped from going after a non-permitted user if they were using less than 900 gallons per day? Yes. Under state law, the limit is 5,000 gallons per day, Your Honor, for domestic use. Well, but I'm saying even if it turned out that this went into- because, you know, water became scarce, would you say you'd be equitably stopped because of this agreement from enforcing- from limiting them to less than 900? Generally, no, Your Honor. Again, I think as Mr. Smeltzer emphasized, it is an exemption from permitting, from applying for a permit and meeting the standards to obtain one, but there is no exemption from the priority system. And, you know, there are two, three key Supreme Court decisions. Well, and I wanted to just make sure your answer was consistent on that, which is, first of all, you never gave them any rights in 1979 by agreeing- or with the judgment. And by modifying the judgment today, you're also not giving them any rights. That is absolutely correct. This is all just aspirational. Yes. And I think what's very important, I'm going to point to ER 384, because I think language in the judgment in 1979 is very important. It states, Water for domestic use is not included within this judgment, nor adjudicated herein, since the use of water for domestic purposes is de minimis insufficient for water for such domestic purposes always should be available. The key words there are not included within the judgment and not adjudicated. So as Mr. Smeltzer emphasized, the 1979 judgment doesn't even apply to nonparties, but even if it did, even if his argument was successful that somehow it was a broader general adjudication, they simply, the district court simply did not adjudicate the small uses, including the permit-exempt uses for domestic use and stock water. And essentially, the court just left it aside. It was not a general adjudication because only a discrete population of water users, State water users, were summonsed and brought into the case, and those were the holders of the State water right permits, certificates, and so forth. So, you know, certainly we respect, we do have a special situation with this case in that we do have a Federal decree, because the case was brought by the United States, and there is a unique situation where the State would not necessarily enforce with regard to priority, because it would be the job, ultimately, of the court if we have a situation where the nonparties are brought in. But the State's objective and why it reached a settlement agreement was to avoid a situation where hundreds of people would have to be brought in to have their relatively small amounts of water adjudicated, even though cumulatively there is an impact on the senior rights both of the tribe and State citizens, who are the ones who actually are curtailed when the flow goes below 24 cubic feet per second. The State decided it would be a much better use of resources to work out an agreement, have mitigation to mitigate for reasonable domestic uses, and therefore avoid protracted litigation. Your Honor, I see I've run out of time. Unless you have any further questions, I will sit down. I think we're good. Thank you. Yes, thank you, Your Honor. In 2015, Judge Bastian issued an order, and he stated the court believes it is necessary to hold a hearing and make findings of fact before making any changes to the court orders and believes it is necessary for the basin landowners, water users, to be given notice and an opportunity to participate in the hearing. That never happened. The case was presented instead of a motion to modify and change those orders. It was presented as an order to show cause with notice given three months prior to the close of objections and landowners given an opportunity to object. They were invited to object. To suggest that they don't have standing sort of defeats the equitable purpose of this. That judgment, as you just heard from Mr. Reichman, specifically says domestic water should always be available. That is a final judgment with a preclusive effect that has been modified without a motion by any of the participants to modify it. But I think their position is, and that's what I was trying to flesh out with some of my questions, it seems like it might bind them in what they do, what the parties did for enforcement actions, but it never guaranteed your clients anything different than what they were already entitled to under state law. And what this does now is takes away that exemption or exclusion from enforcement against those water uses. So you'll see that this case came to the court in 1984 on appeal. How is this any different than say the attorney general says, okay, we understand that having 25 grams of cocaine is illegal, but we're not going to enforce at that level. We're going to enforce only at 100 grams of cocaine usage. That doesn't change the fact that those would be illegal uses, and I'm not suggesting criminal law is analogous here. I'll try to carry it forward, Your Honor. If it said in a final judgment, and your right to carry around 25 grams should always be available to you, you'd have a judgment in defense of that charge. I'm doing what the judgment says, Your Honor. I'm carrying around 20 grams, and the judge said I can and I should always be able to. And that's been taken away without a motion, without any kind of evidentiary proceeding, and that's the basis of our objection to it. So if there's no further questions, I'll rest. Okay, thank you. Thank you to counsel on this complicated but important case, and that concludes our hearings for today, and the court will be in recess.
judges: WATFORD, NELSON, LEE